[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
 STATEMENT OF THE CASE
This legal morass started somewhat innocently when in 1999 the plaintiff approached the defendant Jeffrey Reilly to have him perform a home inspection of a colonial homestead he was considering buying. This property, located at 125 Main Street in Cheshire, had been vacant for some time and was in need of substantial rehabilitation. CT Page 16648
more business oriented until three separate and distinct relationships existed. Each of the three is a subject of this litigation. Shannon Group Associates is an LLC owned and operated by Reilly. Erika Reilly is his wife.
While the parties disagree on the sequence of events and what their respective roles were in each relationship, there is no serious question that the plaintiff became a creditor of the defendant Reilly, that Reilly or his Shannon Group became the plaintiff's employer, and that the plaintiff purchased 125 Main Street and expected Reilly and Shannon to do the rehabilitation.
The plaintiff's Third Amended Complaint is in thirteen counts.
Not to be outdone, the defendants have filed ten special defenses and a four count counterclaim.
The court will address the three basic business agreements entered into by and between the parties and include the special defenses treating with those business functions in its discussion of each.
 DISCUSSION I Counts 1-5, the Alleged "Loans"
The plaintiff relies on Exhibits D, E, F, G and H to support his claim of loans extended to the defendants. Exhibit E is a bank "debit advice" indicating the plaintiff's account was charged with a $12,000 payment to the Shannon Group and Exhibit F is a check for $12,000 from the plaintiff to Shannon. Exhibit G is a check to Erika Reilly for $3,000. The dates of these items are significant: June 15, June 30, and August 31, all 2000.
The explanations offered by the defendants Jeffrey Reilly and Erika Reilly, denying the obligations, border on the incredulous. Jeffrey Reilly actually testified that he did not need the loans, did not ask the plaintiff to advance them and wasn't aware the funds were in the Shannon account. When asked why then he didn't just return the money to the plaintiff, his response was that he had used it up before he realized it! Ms. Corsaro, the Shannon office manager, could not recall if she had told Mr. Reilly about the funds deposited in the Shannon account by the plaintiff.
Erika Reilly testified that she had to advance her own funds on behalf of Shannon to forestall legal action by Amex, a Shannon creditor. She CT Page 16649 claims the plaintiff took the blame for making a late payment on the Amex account and reimbursed her — with his check designated on the face "loan." This version of the transaction is in direct contradiction to the plaintiff's version.
Rendering the defendants' testimony totally unbelievable are Exhibits D and H. Both documents bear the signatures of Mr. Reilly and Mr. Rosier. Exhibit D appears to be an agreement for the plaintiff to "invest" $15,000 in Shannon at 7% interest. It is dated October 26, 1999 and calls for 12 repayment installments commencing December 1, 1999.
Exhibit H is also signed by Reilly and Rosier on October 3, 2000 and is captioned "Loan Agreement." It refers to and acknowledges the payments evidenced by Exhibits E, F, G and H and summarizes the debits and credits between the parties as of October 3, 2000. Reilly acknowledges a debt in the amount of $44,000 as of September 25, 2000 and agrees to pay $2,000 a month from October 1, 2000.
The defendant Jeffrey Reilly has denied the allegations of counts one and two dealing with the loans, and has interposed two special defenses. The first is directed to the first and second counts:
"In September, 2000, the parties verbally agreed that any monies owed to the plaintiff by the defendants would not commence to be repaid until one of two events occurred: 1) profits at the Shannon Group sufficiently increased after an expansion project was undertaken at the behest of the plaintiff to support the payment of an extra $2000.00 per month, or 2) the Cheshire Project was completed and sold, with the net proceeds, (after deductions by the defendants for the cost of labor and materials,) split 55%/45% (later renegotiated to 65%/35%) between the plaintiff and the defendant.
To date, because neither one of these events has occurred, there are no monies due and owing by the defendants to the plaintiff."
The most obvious weakness to this defense is that, even if it were true and the agreement was made in September 2000, it was superceded by the agreement of October 3, 2000.
This special defense also involves the statute of frauds because it constitutes the oral modification of an existing contract. As such, it is valid only if there was consideration and the defendant had partly performed the contract. Union Trust Co. v. Jackson, 42 Conn. App. 413, 419
(1996).
This special defense must be rejected on both grounds. An examination CT Page 16650 of Exhibit H reveals no consideration flowing from the defendants and it specifically notes no payments have been made.
Finally, the defense is rejected because the court does not believe Mr. Reilly's testimony on the issue. Putting aside the skepticism engendered by its effect on the plaintiff and raising the question of why he would agree to it, the terms of the modification are vague and impossible of enforcement.
For example, at what point would profits increase "to support the payment of an extra $2,000.00 per month"? And, why would a September 2000 oral modification be ignored, in the October 3, 2000 "loan agreement" (Exhibit H) which called for $2,000.00 per month payments?
The second special defense is directed to the second count:
"Any so-called `loan' to the defendant Erika Reilly by the plaintiff was really an advance against the proceeds of the sale of the Cheshire Project. The alleged `loan' made by the plaintiff to the defendant Erika Reilly was necessitated by the plaintiff's own failure, as the defendants' Director of Operations/Financial Manager, to meet the defendants' agreed-upon payment schedule with American Express in a timely fashion after he was notified of the same in writing. As a result of this delict, American Express accelerated and increased the terms of the repayment schedule, to the financial detriment of the defendants."
As noted above, this transaction was evidenced by the plaintiff's check, Exhibit G, indicating a loan. And, that sum and date was included in the summary set out in Exhibit H.
As for the allegations of misfeasance on the part of the plaintiff, the defendants bear the burden of proof. From his own mouth, the defendant Jeffrey Reilly repeatedly stated that he was too busy in the field to be concerned with finances and the state of his business. He produced witnesses who concurred with this view. Erika Reilly was not involved in the business in any way, she said. The plaintiff's statement that the Amex payment was not made because there was insufficient money in the LLC account is supported by the fact that payrolls were often not current and by reference to the Shannon checks for the year 2000 and the account summaries, especially Exhibit M.
That exhibit indicates that the account was overdrawn in August 2000 for substantial sums.
The second special defense to the second count is rejected. CT Page 16651
The third count is directed at Jeffrey and Erika Reilly and sounds in unjust enrichment. The plaintiff chose not to proceed against Erika Reilly because of her pending bankruptcy. This count, as to her then remains open.
As to Jeffrey Reilly, in view of the court's ruling above on counts one and two, this count is dismissed.
Unjust enrichment is available where the one seeking compensation has no remedy by an action on the contract. Cecio Bros., Inc. v. Greenwich,156 Conn. 561, 564 (1968).
The plaintiff has such a remedy and has received an award under the underlying contract.
Counts four and five are directed at the defendant Shannon Group 
Associates, LLC. Count four alleges that Shannon is liable for the debts of Jeffrey and Erika Reilly because Jeffrey Reilly was acting as the agent and guarantor for Shannon when he incurred the obligations addressed in the first three counts. Count five claims Shannon was injustly enriched at the plaintiff's expense.
There is no question that the funds advanced by the plaintiff went into the Shannon account. It is also obvious to the court that Shannon was owned, operated and controlled by Jeffrey Reilly. Shannon's funds were treated as his funds. It is also uncontroverted that the plaintiff knew Shannon was receiving the funds he advanced and was aware of Reilly's role in Shannon.
In light of all this, the loan documents were still not negotiated with Shannon, but with Reilly. In Exhibit H, the last document executed, the plaintiff utilized this language: "Therefore, as of September 25, 2000, the outstanding debt owed to Marshall Rosier from J. Reilly is $44,000.00."
Reilly made no representations as to his role but Rosier knew he was Shannon's owner and principal.
". . . where a party knows of the relationship between a corporation and its shareholder and chooses freely and voluntarily to deal or contract with them in their respective capacities, that party is estopped to claim that the individual shareholder is the alter ego of the corporation or vice versa." 1 Fletcher Cyc Corp., § 47, p. 774, (1990).
Therefore, judgment must enter for the defendant Shannon on count CT Page 16652 four. The existence of a remedy under the contract against Reilly (Exhibit H) also precludes recovery against Shannon on an unjust enrichment theory, and judgment must enter for Shannon on Count five as well.
In summary, the court concludes that in Exhibit H, the October 3, 2000 "Loan Agreement," Marshall Rosier and Jeffrey Reilly adjusted the credits and debits arising from the loans made by Rosier to Shannon, the expenses Rosier owed Shannon, and the loan to Erika Reilly. It also incorporated the October 26, 1999 agreement, Exhibit D. The balance so agreed upon was $44,000 and the plaintiff is entitled to that sum plus interest of 10% per annum from October 1, 2000, the date of the default by Reilly. The interest rate is governed by § 37-3A.
The first count having been subsumed by the second count, judgment may enter for the plaintiff Marshall Rosier against the defendant Jeffrey Reilly in the amount of $44,000 plus interest as noted above computed to this date at: $5,207.35.
 As to Counts 6 through 8
The court is unable to distinguish a true difference between the sixth and seventh counts, with the former claiming a breach of contract and the latter a breach of a promise to perform the agreement. The eighth count alleges the work was not done in a timely and workmanlike manner, all to the plaintiff's detriment.
From the trial evidence, there is no doubt that an agreement was reached whereby the plaintiff would acquire 125 Main Street and the defendants would perform the rehabilitation in return for a portion of the profit when the building was sold.
While each side blames the other for the collapse of the project, there is no question that the plaintiff did his part in spending $90,000 to acquire the property.
The actions of the defendants after this dictate the conclusion that they could not or would not do what was necessary to perform as they had agreed. Initially, it became obvious that this was no $50,000 repair job. The defendants did not have the resources to invest the kind of money in labor and materials they soon realized was necessary. Lacking skilled employees, all labor would have had to come from outside hiring. Work progressed at a snail's pace and when a problem was encountered, the defendants' solution was to go off and do another small area. This gave the appearance of progress, forestalled outside hiring, and enabled the CT Page 16653 defendants to spend very little.
Unfortunately, this also resulted in an unworkmanlike project. The court, as noted, visited the site and heard the testimony of experts and the town building inspector. This witness, Leonard Cunningham, noted the defendants had started to demolish areas and do other work without securing the required permits. On a site visit in the cellar, he noted sagging beams, new joists bolted to old carrying beams, decayed material, and damage from powder post beetles.
Even the defendants' expert, Todd Gibbons, admitted that the project had not proceeded in a proper manner and stated that the foundation should have been addressed first, attending to the "bulge" referred to by the defendants on their web-site and to the unstable front wall. He also admitted it was a breach of construction standards for the defendants not to have provided work and materials on the interior-exterior allocation. Jonathan Fink, a defense witness, indicated that less than half the job had been done when he was doing work in October 2000.
It would serve no purpose to repeat in detail the defects described by Mr. Schlegal and Mr. Matoc, both plaintiff's witnesses. In sum total, this was a total disaster from the beginning and the defendants were negligent in not recognizing the enormity of the project, in going about the corrective work in the wrong sequence, and in doing a lot of defective and incomplete work in an unworkmanlike manner. The foundation faults were known to Reilly, Frink and admitted by Gibbons.
The defendants have interposed special defenses three through six to these counts. The court rejects all four as either irrelevant or unproven, or both. The third addresses the plaintiff's nonfeasance but there was no proof that this inaction caused the project to falter. The fourth special defense argues that this wholesale debacle was the plaintiff's fault for having failed to control the defendants and their work schedules and for having failed to have the defendants earn enough money to perform the agreement.
On the latter point, no evidence was produced by the defendants to support any claim of this sort against the plaintiff. As for the first point, it was the responsibility of the defendants to perform the agreement and to suggest that an employee of the defendants prevented them from working is absurd to say the least.
The fifth special defense is totally without merit. By November 2000, the project was at a standstill and the plaintiff was left in a salvage effort. The proceeds of the plaintiff's construction mortgage had also been spent. CT Page 16654
Having addressed above the defendants' actions and the work they performed, the court dismisses the sixth special defense as totally frivolous.
Judgment may enter for the plaintiff on the sixth and seventh counts, the court finding that the defendants breached the agreement and the plaintiff relied on their promise to his detriment. Judgment may enter for the plaintiff on the eighth count as the court finds the defective workmanship contributed to the failure of the project.
On these counts the plaintiff is awarded $90,000, the amount he lost by purchasing the property and then losing it on foreclosure.
 As to Counts 9 and 10
In his ninth count, the plaintiff alleges the transaction between the plaintiff and the defendants Jeffrey Reilly and Shannon was subject to the provisions of the Home Improvement Act, Section 20-418 et seq., specifically §§ 20-427 (i) and 20-429.
Section 20-427 (c) renders violations of the act per se violations of the Connecticut Unfair and Deceptive Trade Practices Act (CUTPA), §42-110b(a). The tenth count seeks relief for the CUTPA violations.
There appears to be no disagreement as to what the parties agreed upon initially. The plaintiff has pleaded the argument in his sixth count:
1. In December 1999, plaintiff located an investment opportunity, to wit, a house in Cheshire that needed to be rehabilitated and then resold.
2. Regarding the investment opportunity, plaintiff and defendant Jeffrey Reilly, Jr. entered into the following agreement:
 a. Plaintiff would purchase the property in Cheshire for $90,000.
 b. Defendant Reilly agreed that in return he would pay for and/or provide all labor and materials to rehabilitate the property.
 c. In return for the mutual promises, after the property was rehabilitated and sold, the parties would divide the net proceeds resulting from the sale of the CT Page 16655 property as follows: 65% for the plaintiff; 35% for the defendant.
Section 20-419 (4)(C) excludes from the definition of "Home Improvement": "the sale of goods or services furnished for commercial business use or for resale. . . ."
The agreement in question provides for work fitting this exclusion. Therefore, these counts must be dismissed.
 As to Counts 11 through 13
The court granted the plaintiff's motion to amend his complaint to conform to the evidence at the conclusion of the case. The plaintiff has filed these three additional counts, sounding in fraud and intentional misrepresentation in various forms.
"The essential elements of an action in common law fraud, as we repeatedly held, are that: (1) a false representation was made as a statement of fact; (2) it was untrue and known to be untrue by the party making it; (3) it was made to induce the other party to act upon it; and (4) the other party did so act upon that false representation to his injury. Billington v. Billington, 220 Conn. 212, 217, 595 A.2d 1377
(1991); Kilduff v. Adams, Inc., 219 Conn. 314, 329, 593 A.2d 478 (1991);Maturo v. Gerard, 196 Conn. 584, 587, 494 A.2d 1199 (1985). The party asserting such a cause of action must prove the existence of the first three of these elements by a standard higher than the usual fair preponderance of the evidence, which higher standard we have described as "clear and satisfactory' or "clear, precise and unequivocal.' Rego v.Connecticut Ins. Placement Facility, 219 Conn. 339, 343, 593 A.2d 491
(1991); Kilduff v. Adams, Inc., supra, 327." Barbara Weisman, Trustee v.Kaspar, 233 Conn. 531, 539-40, 661 A.2d 530 (1995); Suffield Dev.Associates Ltd. Partnership v. National Loan Investors, L.P.,64 Conn. App. 192, 202 (2001).
While most of the representations alleged in counts eleven and twelve were obviously false, the proof offered by the plaintiff did not rise to the level required and set out in the above quotation.
For example, Jeffrey Reilly's claimed expertise in the renovation of historical homes is seriously doubted and his performance on this project strongly suggests he was hopelessly out of his element and floundering from the beginning. However, the proof in this area was not "clear, precise and unequivocal." Mr. Reilly exudes confidence and on the stand he used the trade lingo freely and had an answer for virtually every CT Page 16656 suggestion that his performance was deficient.
As to count thirteen, it was obvious by June of 2000 that Shannon and Reilly were in financial difficulty and the plaintiff, by now an "insider," had to have realized this. Their failure to perform by this time could hardly have misled the plaintiff who was already on notice that he had made a series of unfortunate decisions.
The quality of the work performed in the cellar is deplorable. The court's opinion is supported by the plaintiff's experts and even by the defendants' expert. However, the court cannot assume from this that Reilly's representations as to getting the job done and completing it on schedule were falsely made at the onset.
The plaintiff may have been wise to explore more precisely with Reilly how he arrived at his estimate for the repairs and who was going to do the difficult work in the cellar. Reilly's recitation of his qualifications would lead one to believe he could handle this project and had the know-how and contacts to pull it off.
These three counts have not been proved and judgment must enter for the defendants.
 As to the Counterclaim
The defendants have asserted a four count counterclaim, restating in part allegations contained in their special defenses.
The first count alleges misconduct on the part of the plaintiff in the handling of the Shannon finances. No plausible evidence was presented to suggest that the Shannon financial woes were caused by the plaintiff. In fact, without his infusions of cash, Shannon would have been insolvent in 2000.
The second count alleges misfeasance by the plaintiff in the manner in which he performed his duties and advocated and undertook an expansion program which ended unfavorably for the defendants. The evidence to support this court is nonexistent, but the allegation poses the question: what was this purportedly knowledgeable and experienced businessman (Reilly) doing when all this was going on? No company books or records, save for check registers kept in a makeshift style, were available on the question of the company's earnings, losses, etc.
Of significance on the plaintiff's role in the company is Mr. Reilly's testimony before the state unemployment commission in which he said he was the sole decision maker at Shannon and the plaintiff had no authority CT Page 16657 whatsoever.
The court has already found the defendants breached the agreement in question, so the third count must fail.
The fourth count ignores the contents of Exhibit H in which many of the items described are addressed.
Judgment may enter for the plaintiff on the defendants' counterclaim.
 Conclusion
The plaintiff is awarded judgment against the defendant Jeffrey Reilly on count two and against Jeffrey Reilly and Shannon Group Associates, LLC in counts six through eight as follows:
a. as to count two, $44,000 plus interest to date: $ 49,207.35
b. as to counts six through eight: $ 90,000.00
Total $139,207.35
The court will hear the parties post judgment on the plaintiff's motion for sanctions and counsel fees.
Anthony V. DeMayo, J.T.R.